UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MUHAMMAD ZAHID CHAUDHRY,

                    Plaintiff,

          v.

JANET NAPOLITANO, et al.,

                    Defendants.

NO. CV-09-3097-LRS

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**BEFORE THE COURT** is Defendants' Motion for Summary Judgment, Ct. Rec. 14, filed August 10, 2010 and noted without oral argument on September 30, 2010.

**I. FACTS**

The following facts[1] represent the Defendants' statement of material facts in support of Defendants' summary judgment motion.

Plaintiff, Muhammad Zahid Chaudhry, a native and citizen of Pakistan, was born in Lahore, Pakistan in 1973. Chaudhry graduated from the University of Punjab with a Bachelor of Science degree in math and

---

[1]Chaudhry attempts to dispute these facts in his recent declaration dated June 29, 2009. Ct. Rec. 16-3. Many of the facts disputed are not material facts. Additionally, Chaudhry states in his opposition to the summary judgment motion that he has a "terrible memory."

ORDER ~ 1

physics. After graduation, in 1994, Chaudhry moved from Pakistan to Australia in order to attend the University of Wollongong.  In March 1996, Chaudhry was working in Sydney as a taxi driver, when he picked up two passengers including an Australian citizen named Brad Ewen Hinsby. Hinsby apparently did not have enough cash to pay Chaudhry the fare, so he left his passport with Chaudhry as security for the unpaid fare. Chaudhry kept Hinsby's passport.  Shortly thereafter, Chaudhry's employer fired him from his job as a taxi driver.

On March 20, 1996, Chaudhry entered a Medicare office in Sydney, and filled out and signed a request form for a Medicare card in the name of "Brad Ewen Hinsby." Chaudhry listed his own address, "Post Office Box 236, Annandale," on the form. When he submitted the form to a clerk, he produced Hinsby's passport and purported to be Hinsby. Later that day, at about 3:45 p.m., Chaudhry entered a Roads and Traffic Authority office in Sydney, and filled out and signed a New South Wales identification card application in the name "Brad Ewen Hinsby." When asked for identification, Chaudhry produced Hinsby's passport and purported to be Hinsby. A photo of Chaudhry was taken for the new identification card, and a security camera captured Chaudhry leaving the office.

Later that day on March 20, 1996, at about 4:00 p.m., Chaudhry entered a bank and attempted to open a cashcard account in Hinsby's name. Chaudhry again produced Hinsby's passport and purported to by Hinsby. The bank teller noticed a discrepancy between Chaudhry and the passport photo. The bank manager thus denied the application, and the

ORDER ~ 2

bank informed police of the matter. A security camera photographed Chaudhry at the bank.

Police interviewed Chaudhry on March 22, 1996, regarding his use of Hinsby's passport. Chaudhry had the passport in his possession at the time, but denied using it when he applied for the Medicare card, identification card, and cashcard on March 20. During the interview, police found an American Express ("AmEx") card in the name of "Peter R. Hammond" in Chaudhry's wallet. Chaudhry claimed that he found the Hammond AmEx card in his taxi the previous night and intended to return it, but police determined that he had used it on 28 occasions to make food and taxi fare purchases totaling $851.30.

Sydney police investigated further and called Chaudhry for an interview on April 3, 1996, which he voluntarily attended. Police showed Chaudhry the Medicare form he had filled out, at which point Chaudhry stated that he "felt sick" and declined to answer further questions. Based on Chaudhry's use of Hinsby's passport and Hammond's AmEx card, the Sydney police arrested Chaudhry on April 3, 1996, and charged him with several fraud-related crimes.

On April 22, 1996, Chaudhry pleaded guilty to all of the charges against him based on his use of Hinsby's passport and Hammond's AmEx card.  The resulting convictions and sentences were as follows:

> (1) Use [of] false instruments - Crimes Act 1900, Section 300(2), 2 Charges -Resulting in a $100 fine and rising of the court;
> (2) Make false instruments - Crimes Act 1900 - Section 300(1), 2 Charges - Resulting in a $250 fine, a $50 charge for court costs, and a rising of the court;

(3) Use [of] passport issued to another person - Passports Act 1938, Section 9A(1)(c), 3 Charges - Resulting in a $100 fine and risings of the court;
(4) Goods in custody (GIC) - Crimes Act 1900, Section 527(c), 1 Charge - Resulting in a $100 fine; and
(5) Obtain financial advantage by deception - Crimes Act 1900, Section 104, 2 Charges (including one with 27 counts) - Resulting in a 2-year conditional release upon posting $1,000 bond and a rising of the court.

Chaudhry remained in Australia and eventually married an Australian citizen named Jane Waid on January 3, 1998. Chaudhry's marriage to Waid lasted less than two years; they divorced on December 21, 1999.  Chaudhry had applied for a spousal visa in Australia based on his marriage to Waid, but the Department of Immigration and Multicultural Affairs("DIMA") denied that application on November 25, 1998. DIMA sent Chaudhry a "Decision Record," which explained the basis for its denial of the spousal visa. The Decision Record noted that among the documents DIMA considered was a "POLICE REPORT DOCUMENTING APPLICANT'S FRAUDULENT USE OF AN AUSTRALIAN PASSPORT; HIS FRAUDULENT USE OF AN AMERICAN EXPRESS CARD."

Chaudhry sought review of the November 25, 1998 decision denying his application for a spousal visa. His administrative appeal of that decision remained pending before the Migration Review Tribunal ("MRT") until August 2000, at which time Chaudhry's appeal was denied as discussed further below.

While living in Australia, Chaudhry applied for United States nonimmigrant tourist visas on June 9, 1998 and July 15, 1999, by submitting DS-156 visa applications to the American Consulate in Sydney. The applications asked the following question: "Have you ever

been arrested or convicted for any offense or crime, even though subject of a pardon, amnesty, or other similar legal action?" In response to that question, Chaudhry failed to disclose his April 22, 1996 arrest and convictions in Australia. United States authorities granted the visas.

From 1998 through 2000, Chaudhry traveled to the United States on several occasions to visit his uncle, Alla Ditta ("Raza") Choudary, who was working as a professor at Central Washington University.  In August 2000, Chaudhry had been traveling outside of Australia, and on August 22, 2000, he arrived on an international flight from Singapore to Sydney. Chaudhry filled out an "Incoming Passenger Card," falsely listing his name as "Zahid Mian" and his date of birth as September 15, 1974. Chaudhry attempted to re-enter Australia using an Australian passport in the name of "Zahid Mian," which he had fraudulently obtained using a bogus birth certificate.

Upon his arrival on August 22, 2000, Australian authorities detained Chaudhry, cancelled and impounded the fraudulent passport, and transferred him to the Villawood Immigration Detention Center. The immigration authorities interviewed Chaudhry on August 23, 2000, at the detention center. During the interview, Chaudhry admitted to his true identity, and he admitted that he was a citizen of Pakistan. The Australian immigration authorities determined that when he sought to enter on August 22, 2000, Chaudhry had no valid visa for entry. On August 23, 2000, Chaudhry wrote a letter seeking to withdraw his visa application, and expressing his desire to leave Australia as soon as possible.

On August 28, 2000, the MRT issued a decision affirming the
decision to deny Chaudhry a visa on the basis of his prior marriage to
Jane Waid. The decision noted Chaudhry's prior "convictions for
'fraudulent' behaviour," and stated that Chaudhry had attempted
to explain those convictions in a letter from his agent dated April
17, 2000.  The MRT mailed the August 28, 2000 decision, as well as an
earlier notice that a decision had been made, to Chaudhry at the
following address: Mr. Muhammad Zahid Chaudhry, PO Box 236, ANNANDALE
NSW 2038.  On or about August 30, 2000, Chaudhry left Australia.  He
briefly visited Pakistan prior to traveling to the United States on
September 12, 2000.

On September 12, 2000, Chaudhry arrived in the United States on a
tourist visa as a visitor for pleasure. After entering the United
States, Chaudhry resided with his Uncle Raza in Yakima, Washington.
Three days after Chaudhry entered the United States, on September
15, 2000, Raza filed articles of incorporation for "Shafy
Corporation." The Shafy Corporation application listed Chaudhry as
both the contact person for the application and one of three
incorporators.

At some point prior to December 2000, Chaudhry met Ann
MacKenzie ("Ann") at a restaurant in Yakima. On December 31, 2000,
after having known each other for about two months, Chaudhry and Ann
decided to marry.  They married on January 25, 2001.  On January 30,
2001, Ann filed an I-130 visa petition on Chaudhry's behalf, and the
same day, Chaudhry filed an I-485 Adjustment of Status application.
The I-485 application filled out by Chaudhry asked the question:

"Have you ever, in or outside the U.S. . . . been arrested, cited, charged, indicted, fined, or imprisoned, for breaking or violating any law or ordinance, excluding traffic violations?" Chaudhry checked the "No" box next to this question. Chaudhry signed the I-485 application under penalty of perjury. In conjunction with his I-485 application, Chaudhry signed and submitted a Biographic Information form (Form G-325A), which contained a box asking for "ALL OTHER NAMES USED (Including names by previous marriage)." Chaudhry left that box blank, except for an apparent slash mark. The form also asked for Chaudhy's employment history going back five years, but Chaudhy listed "NONE" as his employment from August 2000 to the "Present Time."

On January 31, 2001, the former Immigration and Naturalization Service granted Chaudhry employment authorization. He had not been authorized to work in the United States at any point prior to that date. He has not presented any evidence that he filed a tax return for 2000, and has admitted that "it is probable that he did not file taxes prior to 2001."

On March 14, 2001, Chaudhry enlisted in the Washington Army National Guard. That same day, Chaudhry signed a Record of Military Processing and certified the truth of the information in the form. Yet the form falsely stated that Chaudhry attended a university in Columbia, Missouri from February 1989 to February 1994, and the

///

///

///

///

ORDER ~ 7

University of Alabama from February 1994 to August 1994.[2]

On June 11, 2001, Chaudhry applied for a reserve officer position with the Yakima Police Department ("YPD") by submitting and signing, under penalty of perjury, a YPD Personal History Statement ("Reserve Application"). The first page of the Reserve Application included the following printed question, followed by "Yes" and "No" boxes: "City of Yakima Civil Service Rules require some employees to be U.S. citizens. Can you provide such documentation?" Chaudhry submitted his application with the "Yes" box checked. The Reserve Application also asked whether the applicant had "ever been arrested, cited, or convicted of a crime?" Chaudhry marked an "X" in the "No" box. He also indicated on the application that he never had been fired from a job.

Gary Belles, a Lieutenant with the YPD, conducted a background investigation with regard to Chaudhry's application for the reserve officer position. On August 27, 2001, Belles interviewed Chaudhry's Uncle Raza. Raza told Belles that Chaudhry previously worked for him by handling the bookkeeping and billing for a medical business that Raza used to own, and managing rental properties for Raza. Raza stated that he had paid Chaudhry $1600 per month for handling the medical billing, and "piece rate" for his property management services.

---

[2]Plaintiff rebuts this fact with "Declaration of James Blackhart" explaining that the military form does not allow one to enter a foreign school so the applicant must sometimes list an equivalent school on the form.  All education information is verified at the MEPS office before a recruit can be enlisted.  Ct. Rec. 33-3.

ORDER ~ 8

On September 14, 2001, Chaudhry applied for a regular officer position (as distinguished from the reserve office position) with the YPD by submitting and signing an "Application for Employment" form. The application form asked for employment history information, and Chaudhry stated in his application that he worked as an "Accounts Manager" for "Rosa Corporation" in Yakima from September 2000, to May 2001. He further stated that he made $14.50 per hour and worked 50 to 60 hours per month, his supervisor was Dr. Rosa Martinez, and his duties related to "medical billing."

On October 11, 2001, Belles and two colleagues conducted an oral board interview of Chaudhry. At that interview, Chaudhry claimed to be a United States citizen and that he could provide proof. However, Chaudhry never provided any proof of U.S. citizenship. Chaudhry also denied, again, ever having committed any crimes, whether misdemeanor or felony, or having been convicted of any crimes. He also denied ever having been terminated from a job. At the end of the oral board interview, Belles scheduled Chaudhry for a pre-employment polygraph examination with Detective Rick Schuknecht for October 22, 2001.

On October 22, 2001, Detective Schuknecht met with Chaudhry to conduct the polygraph examination. Prior to conducting the polygraph exam, Schuknecht asked Chaudhry a series of questions. Schuknecht asked Chaudhry whether he had "ever used a name other than the one you have listed on your application?" Chaudhry answered "No." Schuknecht also asked Chaudhry whether he ever had been "held, detained, questioned, or taken to jail for any reason?" and whether he had "ever been convicted of a misdemeanor or felony?" Chaudhry answered "No" to

both of these questions. Chaudhry also denied ever having resigned, faced dismissal, or had "serious trouble" at any job. Additionally, on October 22, 2001, prior to the polygraph examination, Chaudhry filled out a crime information sheet on which he indicated with the letter "N" that he had never committed, been charged with, or been convicted of any of the listed crimes. The list of crimes included "Forgery," "Forged ID," and "Illegal Use of Credit Card." The YPD did not hire Chaudhry for either the reserve or regular officer positions that he had sought.

On November 15, 2003, Chaudhry's Washington Army National Guard unit was mobilized and he reported for active duty in support of Operation Iraqi Freedom. On November 20, 2003, United States Citizenship and Immigration Services ("USCIS") served on Chaudhry a Notice of Intent to Rescind his lawful permanent resident status. USCIS charged Chaudhry with failing to disclose his Australian fraud convictions when he appeared for an interview regarding his I-485 application on April 25, 2001. USCIS eventually declined to pursue recission of Chaudhry's lawful permanent resident status because the agency was under the false impression that he was serving in the Army overseas. Meanwhile, prior to any deployment overseas to Iraq, Chaudhry claimed that he sustained a back injury during training exercises in the United States. Chaudhry never served in the Army in Iraq or elsewhere overseas.

On April 4, 2004, Chaudhry filed an N-400 Application for Naturalization on the basis of his military service. The first page of the N-400 application asks the applicant to provide "other names," if

ORDER ~ 10

any, that he ever has used. Chaudhry responded "none" to this question. The application also asked for work history going back five years, but Chaudhry listed no employment prior to March 2001. The N-400 application asked the following questions regarding criminal history: (1) "Have you EVER been arrested, cited, or detained by any law enforcement (including INS and military officers) for any reason?"; (2) "Have you EVER been charged with committing any crime or offense?"; (3) "Have you EVER been convicted of a crime or offense?"; and (4) "Have you EVER received a suspended sentence, been placed on probation, or been paroled?" This time, Chaudhry placed "X"s in the "Yes" boxes next to each of these questions. Below those questions, he listed his April 22, 1996 Australian fraud convictions. He also admitted to being fined, ordered to pay court costs, and receiving a "rising of the court"[3] as a result of these convictions.

The N-400 application also asked whether the applicant had "EVER given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?" or whether he had "EVER lied to any U.S. government official to gain entry or admission into the United States?" Chaudhry placed "X"s the "Yes" boxes next to these questions and conceded, "When I applied for my resident alien card I omitted my

---

[3]A "rising of the court," in New South Wales, Australia, is a court's "symbolic way of saying that an offender is convicted but no formal sentence is imposed."

ORDER ~ 11

misdemeanor conviction record from Australia." Chaudhry's attorney prepared the N-400 application and he and his attorney signed the application under penalty of perjury on March 29, 2004.

On May 30, 2007, Chaudhry arrived at Seattle-Tacoma International Airport, upon returning to the United States from a trip to Pakistan. U.S. Customs and Border Protection ("CBP") placed Chaudhry in deferred inspection in order to allow for review of his immigration file.  On May 31, 2007, CBP officer Brian C. Smith interviewed Chaudhry under oath regarding his admission into the United States. When asked for his "true and correct name," Chaudhry stated "Muhammad Zahid Chaudhry." Officer Smith then asked Chaudhry "Have you ever used any other names?", to which Chaudhry responded, "No."  At the same interview, on May 31, 2007, Smith asked Chaudhry, "Were you ever arrested by the Australian or Pakistani police?" Chaudhry answered, "I was just questioned and eventually had my resident visa cancelled in Australia and they took me to the airport and I left. I was never placed in a jail."

On July 10, 2008, USCIS officer Terence Lee interviewed Chaudhry under oath regarding his N-400 application. USCIS recorded Chaudhry's oral answers to the interview questions in a sworn statement, which Chaudhry signed under penalty of perjury after making handwritten edits.  At this interview, Officer Lee asked Chaudhry for his "full and legal name," and he responded, "Muhammad Chaudhry." Next, Officer Lee asked Chaudhry if he had "ever used any other names or identities?", to which Chaudhry responded "No."  Later at the July 10, 2008 interview, Lee asked Chaudhry whether he had "ever claimed to be

a United States citizen (in writing or in any other way)?" Chaudhry responded, "Not that I remember, no." Lee then asked "Is it possible that you did," and Chaudhry responded, "No, I wouldn't have, except where I was told 'as in for taxation purposes.'" Later, when asked about his YPD reserve application, Chaudhry stated that he did not claim citizenship on the application. Lee then asked Chaudhry, "Did you ever orally claim that you were a United States citizen during your interview for the Yakima Police Reserve?" Chaudhry answered, "I don't remember, but there were a few terms that I didn't understand . . . ."

Lee also asked Chaudhry in the July 10, 2008 interview whether he had "ever been cited or detained by any law enforcement officer . . . including INS or military officers for any reason?" Chaudhry responded, "No, not in the military. In Australia, I was fined. What's in my application, it should be correct." Lee also asked Chaudhry about his criminal history. Chaudhry denied ever being "put in jail or handcuffs," but admitted that he "had some fines in Australia for a little incident." Later, after Lee made specific reference to the crimes Chaudhry listed in his N-400, Lee asked Chaudhry whether he had "ever been convicted of a crime or offense." Chaudhry responded, "Even though I didn't know at the time, I guess that's a conviction in Australia. Only in Australia, not anywhere else." Chaudhry later attempted to explain his criminal history in Australia, stating, "I was not found guilty. I was told to plead guilty which I did.  The charging officer told me to plead guilty, and

I did. I found out that if you plead guilty, you did the crime. He was swearing so much and I wanted to be out of his sight."

At the July 10, 2008 interview, Lee specifically asked Chaudhry whether he used the name "Brad Ewen Hinsby," or a passport in that name, and Chaudhry stated, "Not that I know of." Lee also asked Chaudhry whether he used the identity, name, or credit card of "Peter R Hammond," and Chaudhry responded, "No, not that I remember. Definitely not intentionally. I was told to plead guilty and I did without knowing what it means." Lee also asked Chaudhry "Have you ever given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal? If so explain." Chaudhry answered, "No," and later amended his answer to read on the transcript "Not, that I can remember." Lee then asked, "Have you ever lied to any U.S. government official to gain entry or admission into the United States?" Chaudhry answered, "Not, intentionally."

Lee then asked Chaudhry, at the July 10, 2008 interview, the question, "When you applied for adjustment of status, you stated you did not have an arrest record. Explain the reasoning that you certified that you had not any arrest record or conviction record on that application?" Chaudhry responded, "My understanding is that the question referred to my time in the US. I pled guilty without knowing what guilty means well over . . . 10 years ago." After a follow-up question, Chaudhry continued, "My attorney explained in the letter, that I didn't have a clear understanding of what happened in Australia. I answered that in good faith."

ORDER ~ 14

1    On August 27, 2008, USCIS issued a decision denying Chaudhry's

2  N-400 Application for Naturalization. Chaudhry requested an

3  administrative appeal (Form N-336) of the August 27, 2008 denial

4  decision.

5    On June 29, 2009, USCIS officer Susan Walk interviewed Chaudhry,

6  who was accompanied by his attorney, under oath regarding his N-400

7  naturalization application and administrative appeal. USCIS recorded

8  Chaudhry's oral answers to the interview questions in a sworn

9  statement, which Chaudhry signed under penalty of perjury after making

10  corrections and reviewing the statement with his attorney.  Walk first

11  asked Chaudhry for his complete name, and he responded "Muhammad Zahid

12  Chaudhry." Walk then asked whether he had "ever used any name or

13  identity in the United States or anywhere else in the world?" He

14  responded, "No." Walk specifically referenced Chaudhry's convictions

15  in Australia for crimes involving his use of the names Brad Ewen

16  Hinsby and Peter Ross Hammond, but Chaudhry denied having used those

17  names.

18    At the June 29, 2009 interview, Walk also asked about Chaudhry's

19  criminal history, and he stated, "Up until 2003 I had no idea that I

20  was arrested or convicted because I took the words of the charging

21  officer who said that there would be no conviction record if you do as

22  you are told." Walk then stated, "But you knew you were convicted,"

23  and Chaudhry replied, "But I didn't know what the legal jargon meant

24  at the time." Walk later asked Chaudhry why he did not disclose his

25  Australian convictions on his two applications for visas to the United

26  States, which asked whether he had been "arrested or convicted for any

offense or crime." Chaudhry stated that, "Up until 2003 or 2004, I had no understanding that I had been arrested or convicted." Walk again asked Chaudhry about his failure to disclose his criminal history on his visa applications, and he responded, "I had a firm belief in what the police officer said that I wouldn't have a conviction record."

At his June 29, 2009 interview, Chaudhry submitted to USCIS a declaration, signed under penalty of perjury. In the declaration, he admitted that he pled guilty to the passport and AmEx fraud crimes in Australia. He also admitted that he "erroneously checked the 'no' box to the question of 'have you ever been arrested or convicted.'" Further, he admitted that he "did not disclose [his] conviction on [his] application for adjustment of status." In the declaration, Chaudhry claimed that he did not actually commit the fraud crimes in Australia, despite his guilty plea. He offered a variety of excuses for why he pled guilty. He claimed that: (1) the Australian police officers told him to admit to the crimes to "avoid any problems" or the possibility of jail time; (2) the police assured him that "it would not go in [his] record" if he pled guilty; (3) the police told him that if he did not plead guilty, "it would be a big headache for everyone"; (4) he was "under great duress"; and (5) he "had no understanding of the legal system."

Chaudhry also claimed in the declaration that he did not disclose his fraud convictions on his visa application or his I-485 adjustment of status application because he "naively believed the police officers who told me that the conviction was not on [his] record." Finally, Chaudhry stated in the declaration that he was being truthful when he

previously stated that he had not used any other names because he was
innocent of the fraud crimes he pled guilty to in Australia. He
stated, "The truth is that I have never used another name . . . . I
have never used any other person's
name or identity."

On August 19, 2009, USCIS issued its final decision denying
Chaudhry's N-400 Naturalization Application. Subsequently, United
States Immigration and Customs Enforcement ("ICE") charged Chaudhry
with removability, alleging that he procured admission into the United
States through fraud, he was inadmissible based on his convictions
for crimes involving moral turpitude, and he had falsely purported to
be a United States citizen. In support of these charges, ICE submitted
a brief and a report on Australian law to the immigration court
explaining why Chaudhry's 1996 fraud convictions qualify as crimes of
moral turpitude.

On October 13, 2009, Chaudhry filed the instant suit, seeking
naturalization under 8 U.S.C. § 1421(c), after USCIS denied his
application for naturalization, finding that he lacked good moral
character. (Ct. Rec. 1). Chaudhry alleges that he meets all the
requirements for naturalization. Id.

In June and July 2010, Chaudhry both swore and testified that he
has no memory of the time he spent in Australia from August 22, 2000,
through August 30, 2000. But he admitted, through counsel, that "it
appears that [he] was briefly detained by Australian Immigration
authorities prior to his departure on August 30, 2000." Discovery has
closed, and Defendants now move for summary judgment.

ORDER ~ 17

II.    **ANALYSIS**

   **A. Burden of Proof on Summary Judgment**

   The summary judgment procedure is a method for promptly disposing of actions. See Fed. R. Civ. Proc. 56. The judgment sought will be granted if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc 56(c). "[A] moving party without the ultimate burden of persuasion at trial [ ] may carry its initial burden of production by either of two methods. The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir.2000). If the movant meets its burden, the nonmoving party must come forward with specific facts demonstrating a genuine factual issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

   If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In opposing summary judgment, the nonmoving party may not rest on his pleadings. He "must produce at least some 'significant probative evidence tending to support the complaint.'" *T.W. Elec.*

ORDER ~ 18

1  *Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th

2  Cir. 1987) (quoting *First Nat'l Bank v. Cities Serv*. Co., 391 U.S.

3  253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

4      The Court does not make credibility determinations with respect

5  to evidence offered, and is required to draw all inferences in the

6  light most favorable to the non-moving party. *See T.W. Elec. Serv.,*

7  *Inc.*, 809 F.2d at 630-31 (citing *Matsushita*, 475 U.S. at 587). Summary

8  judgment is therefore not appropriate "where contradictory inferences

9  may reasonably be drawn from undisputed evidentiary facts...."

10 *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335

11 (9th Cir.1980).

12     **B.   Naturalization Actions Under 8 U.S.C. § 1421(c)**

13     The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1421(c),

14 provides for de novo review by a district court of USCIS's decision to

15 deny a naturalization application. See also 8 C.F.R. § 336.9(b). Under

16 § 1421(c), "the district court has the final word and does not defer

17 to any of [USCIS's] findings or conclusions." *United States v.*

18 *Hovsepian*, 359 F.3d 1144, 1162 (9th Cir. 2004) (en banc)(emphasis

19 omitted). The court is not limited to the facts in the administrative

20 record; it should engage in its own de novo fact finding. *Aparicio v.*

21 *Blakeway*, 302 F.3d 437, 445 (5th Cir. 2002).  Moreover, if a court

22 concludes that a statutory bar to naturalization exists, the court

23 need not engage in fact finding and may dispose of the case by way of

24 summary judgment. *Chan v. Gantner*, 464 F.3d 289, 296 (2d Cir. 2006);

25 *see also Abghari v. Gonzales*, 596 F. Supp. 2d 1336, 1343 (C.D. Cal.

26 2009).

ORDER ~ 19

1    **C.    Naturalization Under 8 U.S.C. § 1440**

2        An alien may seek to naturalize under 8 U.S.C. § 1440(a), based

3    on his active duty service in the United States armed forces. Congress

4    relaxed certain naturalization requirements for such aliens. See 8

5    U.S.C. § 1440(a), (b). Still, an alien seeking to naturalize under §

6    1440, such as Chaudhry, must demonstrate good moral character "for at

7    least one year prior to the application for naturalization," 8 C.F.R.

8    §329.2(d), until the date of naturalization, 8 C.F.R. § 316.10(a). *See*

9    *Santamaria-Ames v. INS*, 104 F.3d 1127, 1130 (9th Cir. 1996).  Because

10   Chaudhry seeks to naturalize under § 1440(a), based on his April 1,

11   2004 naturalization application, the statutory period applicable to

12   him began on April 1, 2003 and continues until such time as he is

13   allowed to naturalize, if ever.

14       An alien's conduct prior to the statutory period also may be

15   considered if it appears relevant to his present moral character and

16   if his conduct during the statutory period does not reflect reform of

17   his moral character. 8 C.F.R. § 316.10(a)(2); *Santamaria-Ames*, 104

18   F.3d at 1130. Chaudhry's conduct prior to April 1, 2003, therefore,

19   appears relevant.

20       As a matter of law, an alien necessarily lacks good moral

21   character if, during the statutory period, he has "given false

22   testimony for the purpose of obtaining any benefits under this

23   chapter." 8 U.S.C. § 1101(f)(6). Such testimony is limited to "oral

24   statements" made both under oath and "with the subjective intent of

25   obtaining immigration or naturalization benefits." *Kungys v. United*

26   *States*, 485 U.S. 759, 781 (1988). "[T]he statements made by an

applicant in a naturalization examination are 'testimony' within the meaning of 8 U.S.C. § 1101(f)(6)." *Bernal v. INS*, 154 F.3d 1020, 1023 (9th Cir. 1998). Likewise, an alien's testimony taken by a Border Patrol agent regarding his admission into the United States constitutes "testimony" under 8 U.S.C. § 1101(f)(6). *See id.*; 8 C.F.R. § 287.5(a) (empowering immigration officers to obtain evidence concerning an alien's entry into the United States); 8 C.F.R. § 103.1(b) (defining immigration officer to include Border Patrol agents).

An alien who provides false testimony during the statutory period is ineligible for naturalization regardless of whether the false testimony was material. 8 C.F.R. § 316.10(b)(2)(vi); *see also Kungys*, 485 U.S. at 780 (holding that § 1101(f)(6) "denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits"). Section 1106(f)(6) does not include a materiality requirement because its primary purpose is to identify persons who lack good moral character, rather than preventing "false pertinent data from being introduced into the naturalization process." *Id.* at 780.

### D. **Chaudhry's False Testimony**

Defendants argue that Chaudhry's false testimony since April 1, 2003, for the purpose of receiving immigration benefits, renders him statutorily ineligible for naturalization. In three separate sworn interviews, Chaudhry provided false testimony to immigration officers regarding his use of a false passport in 2000, his detention by

Australian immigration authorities in 2000, his prior concealment of his criminal history, and his prior claim that he was a United States citizen. Each of these numerous separate instances of false testimony, as a matter of law, prevents Chaudhry from establishing good moral character, and therefore renders him ineligible for naturalization.

Chaudhry, in his opposition, attempts to show that the evidence amounts to a pure factual dispute. Ct. Rec. 24. In essence, Chaudhry asserts that his prior "misrepresentations" were unintentional and inadvertent. Further, Chaudhry argues that his omissions of the alias "Zahid Mian" (on 3 separate occasions) were an honest mistake, most likely due to his faulty memory, his misunderstanding of the question and the lengthy and aggressive interviews to which he was subjected. *Id.* at 11.

Secondly, Chaudhry challenges the admissibility of the following evidence submitted by Defendants in support of their motion for summary judgment: (1) Australian immigration documents showing that Chaudhry used a fraudulent passport to enter Australia and that he sought a visa in Australia; (2) an Australian charge sheet detailing the fraud charges to which Chaudhry pled guilty in 1996; and (3) the record of Chaudhry's May 30, 2007 sworn interview.

To the admissibility challenges, Defendants respond that the Federal Rules of Evidence and the attestation signed by Geoff Jones, a Regional Director with the Australian Department of Immigration and Citizenship Declaration overcome Chaudhry's objections and establish that all of the submitted evidence in support of Defendants' summary judgment motion is admissible. And even assuming, arguendo, that some

of this evidence were excluded, Defendants assert that Chaudhry still cannot establish a genuine issue of material fact to defeat the instant motion. Specifically, Defendants note that the conflict between the facts recounted in Australian fraud conviction records and Chaudhry's version of events is not material to their motion for summary judgment. Other undisputed facts – showing that Chaudhry provided false testimony – establish Chaudhry's ineligibility to naturalize. Defendants explain that the facts recounted in the Charge Sheet merely provide <u>context</u> for his guilty pleas to the fraud crimes in Australia, as well as his belated claims of innocence. Defendants conclude that the undisputed circumstantial evidence shows that Chaudhry deliberately provided false testimony at his 2007, 2008, and 2009 sworn interviews in order to obtain immigration benefits. This Court agrees with Defendants.

This Court finds that a disturbing pattern of deceit for immigration-related purposes permeates this case. The Court rejects Chaudhry's attempts to create a genuine issue by claiming memory lapses and making conclusory protestations of innocence. This court finds Chaudhry's latest declaration in which he, for the first time, attempts to explain his false testimony at the 2007, 2008 and 2009 sworn interviews regarding use of the name "Zahid Mian" cannot defeat Defendants' motion for summary judgment. Specifically, in the declaration Chaudhry initially claims no present recollection of his use of the fraudulent "Zahid Mian" passport in Australia on August 22, 2000. (Plt. Exh. 1 ¶ 3). Chaudhry claims his memory now is so "terrible" that he should not even be able to remember his sworn

interviews in 2007, 2008, and 2009, because he often cannot "recall what happened earlier in the week, much less what happened several years ago." (Id. ¶ 2). It appears to this Court, however, that Chaudhry gave firm, unqualified denials when immigration officers asked him whether he had used any other names. This is not a confusing question.  In addition, at all three interviews, Chaudhry's memory served him well enough to testify at length about events (including his 1996 fraud crime convictions in Australia) that occurred several years prior to his use of the fraudulent "Zahid Mian" passport in 2000.

Chaudhry further offers two inconsistent theories as to why he failed to disclose his use of the name "Zahid Mian" at any of the three sworn interviews; he swears that he either "did not recall those events," or that he was confused by the basic question, "have you ever used any other names." (Id. ¶¶ 5-6). Neither theory creates a genuine issue of material fact regarding his intent at the 2007, 2008, or 2009 interviews. See *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). Here, Chaudhry speculates that his memory lapses "most likely" resulted from: (1) "duress, coercion and intimidation" by CBP officers at the May 30, 2007 interview; (2) "lengthy questioning" at the 2008 and 2009 naturalization interviews;

///

///

///

ORDER ~ 24

(3) his post-traumatic stress disorder[4]; (4) his "severe nightmares"; and (5) his use of "many medications." (Ct. Rec. 33-1). However, such speculation does not create a genuine issue of material fact, and Chaudhry establishes no logical or factual connection between these claims and his alleged memory lapses on three separate occasions in 2007, 2008, and 2009.

Chaudhry's new declaration confirms that he cannot create a genuine issue of fact regarding his state of mind at the three sworn interviews because he lacks any personal knowledge on that issue as a result of his "terrible" memory. See Fed. R. Evid. 602 (witness must have personal knowledge of the matter about which he is testifying). The Court finds that the undisputed false testimony on several occasions in the statutory period precludes Chaudhry from naturalizing. The USCIS decision to deny Chaudhry's naturalization application is sound based on this Court's de novo review pursuant to 8 U.S.C. § 1421(c).

**III. CONCLUSION**

Based upon the reasons and authorities cited above, **IT IS HEREBY ORDERED**:

1. Defendants' Motion for Summary Judgment, **Ct. Rec. 14**, filed August 10, 2010, is **GRANTED.**

---

[4]The court notes Plaintiff never served overseas in Iraq or anywhere else. It is unclear in his declaration what Plaintiff's PTSD originates from.

ORDER ~ 25

2.   The parties' Stipulated Motion for Extension of Time to File Witness and Exhibit Lists, **Ct. Rec. 39,** is **DENIED as moot.**

3.   The District Court Executive is directed to enter this Order, forward copies to counsel, and **CLOSE FILE.**

4.   The Clerk shall enter judgment consistent with this order.

**DATED** this   26th   day of October, 2010.

**_s/Lonny R. Suko_**
_____
LONNY R. SUKO
Chief United States District Judge

ORDER ~ 26